Pickert *v.* Ridgefield Park Railroad Co.

PICKERT *vs.* RIDGEFIELD PARK RAILROAD COMPANY.

Where a railroad company had entered into a written agreement for their right of way, with the person who was the ostensible owner, and also the owner of record, of the property over which the right of way was sought, and by virtue of a license in such agreement, entered into possession and graded their road-bed and proceeded to lay their track, an injunction to restrain them from the use of the property at the suit of the wife of such ostensible owner, who claimed that at the time of making such agreement, she was the real owner of the property by deed unrecorded, and that the agreement and license were made without authority, was refused; it appearing that she was cognizant of the entry of the company and of their work upon the property, and gave them no notice of her ownership, nor repudiated the agreement or license, and the company were guilty of no negligence.

On final hearing on pleadings and proofs.

*Mr. S. Tuttle,* for complainant.

*Mr. M. Knapp,* for the company.

Pickert v. Ridgefield Park Railroad Co.

THE CHANCELLOR.

The bill in this case was filed to restrain the company from entering upon, taking or using, without the complainant's consent, a piece of land of the width of one hundred feet, and of the length of about twelve hundred feet, part of a farm of which the complainant claims to be the owner; and from proceeding further in the construction of their railroad over it, and from laying their rails upon it and running their locomotives or cars over or upon it. It appears that when the bill was filed, the company were in possession of the land in question, and were occupying it for the purpose of their railroad, of which it was part; that they had made an excavation in it of the width of seventy-five feet and of the depth of about nineteen feet, for its entire length, and were about to lay their rails upon it for their railroad. The whole of the railroad in this state was then graded, part of the track laid, and the road ready for laying the track on the part of it on which the track had not yet been laid. It appears also, that the company had so been in possession and had occupied the land for about a year before the filing of the bill. They had entered into possession under an agreement under seal, made on the 14th of February, 1872, between them and Rozel F. Pickert, the complainant's husband, by which, in consideration of one dollar to him paid by the defendants, and in further consideration of the benefits to him of the location of a railway thereon, he covenanted and agreed with them that he would grant, convey and release to them, by a good and sufficient warranty deed, upon being paid therefor the consideration thereinafter mentioned, the strip of land in question; the railroad to be built where it was then located, and the consideration to be paid to be determined by arbitration, and in case of failure of the arbitrators to agree, by umpirage. The agreement further provided that the company might " enter on the land and commence the work of construction before the formal conveyance" might "be executed, they doing no unnecessary damage." The complainant alleges that when this agreement was made, she was the owner of the land, and

she insists that it is not binding on her; that she did not authorize her husband to make it, and that she did not know of its existence until after the company had begun their work on the land. It appears that the price of the land was never fixed; that in August, 1872, some months after the company had begun work on the land, the parties to the agreement each chose an arbitrator to fix the price; that these two, being unable to agree upon it and failing to agree on an umpire, the arbitration was broken up in September or October following, by the refusal of the arbitrator, appointed by Pickert, to serve. The company, by their answer, express an earnest desire to have the value of the land ascertained, either in the manner provided in the agreement or in any other proper and legal mode, and declare themselves ready and willing to pay it when ascertained to the person or persons entitled to it. They allege that it is no fault of theirs that the price had not been fixed before the bill was filed, but that it was by reason of the unwillingness of Pickert to carry out the agreement. On the filing of the bill, an order to show cause why an injunction should not issue according to the prayer of the bill, was granted. The order, however, was not made absolute, and the defendants proceeded to lay their track over the land and to use it as part of their road, of the main line of which it is part.

That the company, in good faith, entered into the occupancy of the premises in question, there is no room to doubt, and it seems equally clear that in treating for the land, they presumed, and had good reason to presume, that the complainant's husband was the owner of the property. The negotiations were all conducted by him. He, indeed, testifies that he apprised the agent of the company from the beginning of the negotiations, that his wife was the owner, but the agent swears that neither the complainant nor her husband, gave him any intimation that the former owned the property, until after August, 1872, and then the grading of the whole road was almost all done. The witnesses, Bartholomew Pickert and Henry C. Cooke, are evidently mistaken as to

the time when the conversations, as to which they testify, took place. The time they fix is a year too early. The conversations probably took place after the arbitration was broken up. Henry S. Downs, the arbitrator chosen by Mr. Pickert, had not, up to the time when he declined to serve further, which was in the fall of 1872, heard that Mrs. Pickert had an interest in the property. Besides, the agreement itself, in all respects, treats the property as Mr. Pickert's. There is nothing whatever in it to indicate that he was not the sole and absolue owner of the land, but on the other hand, it deals with the premises as being in all respects his sole and absolute property. And again, it appeared by the records of Bergen county, in which the land is, from the beginning of the negotiations down to August, 1872, that Mr. Pickert had the title to the land. The deed from Pickert to Anna Downing, and the deed from the latter to Mrs. Pickert, these being the conveyances by which Pickert transferred the property to his wife, were neither of them recorded until the 9th day of June, 1873—more than three months after the bill in this cause was filed. The agent of the company testifies that he was at Pickert's house in Harrington township, (the premises in question,) both before and after the signing of the agreement; that he saw Mrs. Pickert on one of those occasions, and that he and she and her husband always talked more or less about the right of way and about the property. He further testifies that in the early part of September, 1871, he called at Pickert's house, in Harrington township, and there met Mrs. Pickert; that he asked for Pickert, and she told him he was not at home; that he told her he was going to put a railway through Pickert's place, and wanted to see him about a right of way; that she told the witness he would have to see Pickert, and to that end she told him where Pickert's place of business was, in New York. Edward K. Alburtis, who was the president of the company when the agreement was made, and was still such when he testified in this suit, swears that he never heard from any source that Mrs. Pickert owned the land, until the work was

substantially done, and he does not know of any member, officer, or agent of the company having any intimation that she claimed to be the owner of the property before the suit was brought. Delos E. Culver, who was a director of the company, and had the contract for building the whole road, testifies that in the conversations with Pickert, (he had none with Mrs. Pickert,) Pickert spoke of the land as his. Patrick Rehill, who did the grading on the land in question, testifies that in his conversations with Mr. Pickert in reference to the work, (and he talked to him more than once, and on one occasion in the presence of Mrs. Pickert,) he " never understood anything different than that the farm was Mr. Pickert's," and that he always heard Mr. Pickert speak of the farm as his. The insufficiency of the reason given for not recording the two deeds above mentioned, under which Mrs. Pickert claims title, may well lead to the conclusion that her title to the property was intentionally concealed. She claims to have paid to her husband $4000 for the property. He was a bankrupt, and had failed in business about a year before these conveyances were made. She testifies that the reason why the deed to her was not recorded was because it required so many stamps; that after she paid for the property she was "short" in money matters. But she was then in business in the tea trade in New York, and her husband was with her in that business, and she will not say that this $4000 did not go into that business. She says she does not know what became of that money, that she does not know positively whether it came back into the business. Pickert testifies that he and his wife did not record the deed because of the expense attending it in the way of stamps, and that she and he were informed that there was an act of Congress doing away with the necessity of stamping deeds, and they supposed if the deeds were not recorded until that act took effect, it would never need stamping, and that they considered it purely a matter of economy between themselves. Now, when it is considered that Mrs. Pickert had capital

invested in the tea business in New York; that her husband refused an offer of $38,000 for the farm of which the strip of land in question is part; that each deed required only stamps to the amount of $4, and that an inspection of the deeds shows that the deed from Pickert to Downing was fully stamped at its date, May 28th, 1871, and that the other was also stamped at the same time with stamps to an amount sufficient, according to the requirements of law, except fifty cents, the worthlessness and insincerity of this excuse are apparent. Nor is the reason given by Pickert in his testimony for signing the agreement in his own name, entitled to any consideration. To the question, "Why did you sign the agreement in your own name?" he answered, "I don't just remember that, but I am under the impression that it was because I thought the proposed railroad would never come to be a fact."

My conclusion is, that the company did believe, and had good reason to believe, that the property was the property of Pickert, and that they did not know until some time in the fall of 1872, and after they had almost completed the grading of their road, that Mrs. Pickert claimed any title to it. In their occupation of the property Mrs. Pickert acquiesced. The attempt is made to show that she merely seemed to acquiesce, and that that apparent acquiescence was due to the coercion of her husband, but it does not so appear by her testimony. She says, that when the company entered on the land to excavate she knew the fact, and that she made no objection then to their going on the land. She and her husband lived on the property while the work was in progress. When asked for her reason for not objecting, she does not allege restraint, but says she talked with her husband and he thought he could talk to the company better than she could. Although, according to her husband's testimony, she consulted counsel, both in New York and in this state, in regard to this matter, her husband sometimes accompanying her and she sometimes going alone; and although she consulted with her friends, some of whom she says, were "railroad people,"

on the subject, and although, as she testifies, she principally managed the property herself ever since the title was vested in her, yet she never made any objection whatever to the company, to their occupancy of the land, until after they had completed the excavation through it and had laid their rails up to the property, and then her objection was made by means of this suit. I see no evidence on which reliance ought to be placed, that her acquiescence was due to any restraint. According to her own testimony and that of her husband, she was free not only to consult with her friends and relatives on the subject, but with counsel of her own selection, and her husband so far from restraining her in this respect, attended her, as he admits, several times to consult her counsel. Pickert's testimony, that his wife, when he told her of the agreement, was very indignant and said she would consult her father, and did consult other parties; that she never consented to or ratified his proceedings in the matter; and that she insisted on his taking her to the company's office, and said she would go alone if he would not go with her, to see the authorities of the company and object to their pushing their railroad across the farm, is further evidence that she was under no restraint. He says, also, that she did not take measures to stop the construction of the company's road over her premises, because she did not know of the agreement until some months after it was made, and then he assured her frequently that the company would soon be up to see them and settle or have the matter adjusted; that she insisted that it should be done at once, and when she saw the men come on to work, she consulted with her friends as to the advisability of allowing the company to go on with the work without first adjusting the matter.

The sole question before me is, whether this company shall, under the circumstances, be enjoined from the use of their road over the land in question. In the first place, the complainant has an adequate remedy at law, and this court will not interfere by injunction in such a case as this where the complainant has an adequate legal remedy. *Higbie* v. *Cam-*

*den and Amboy Railroad Company,* 5 *C. E. Green* 435; *Morris Canal and Banking Company* v. *Fagin,* 7 *C. E. Green* 430. In the next place, the company have been guilty of no negligence, but appear to have acted with due care and circumspection, and in good faith throughout the whole transaction. They are, under the circumstances, entitled to the favorable consideration of the court. Equity has, in numerous cases, declined to interpose against railroad companies under similar circumstances. In *Deere* v. *Guest,* 1 *Myl. & Cr.* 516, it was held that there was no equity to restrain by injunction the owners of a railroad made over the plaintiff's land, from using the railroad after it had been completed, or from interrupting the plaintiff's workmen in removing it and restoring the land to its original state, although the possession of the land for the purpose of constructing the railroad, might have been obtained from a tenant of the plaintiff, by means of circumvention and fraud. In *Greenhalgh* v. *The Manchester and Birmingham Railway Company,* 3 *Myl. & Cr.* 784, it was held that the owner of land on which a railway company, empowered by parliament, were about to enter, was not entitled to an interlocutory injunction to restrain them from so entering, if, by his silence and conduct, he had permitted them to carry on their works upon the supposition that they were entitled to enter on and take the land in question. See, also, *Langford* v. *The Brighton, &c., Railway Co.,* 4 *Railw. and Canal cases* 69; also *Carson* v. *Coleman,* 3 *Stockt.* 106. In *Wood* v. *Charing Cross Railway Company,* 33 *Beav.* 290, it was held that where a railway company had, *bona fide,* made a mistake, without culpable negligence on their part, as to the lands they had valued and taken possession of, and the question between the company and the land owner was merely one of value, equity would not, by injunction, stay the works on the property taken, and that the court in such cases has regard to the injury which may be done to the public. In this case Sir John Romilly, M. R., said: "I apprehend the rule of the court in all these matters is this: The legisla-

ture empowers the railway company to take the property on paying a reasonable sum for it, but they must not take it arbitrarily, or without giving a fair and reasonable compensation to the owner of the property, and they are bound to put the matter in such a shape that a jury or arbitrator may be able to form an accurate estimate of its value. If a railway company, disregarding the provisions of the act, thinks fit to take possession of the property, to act with a high hand and set the owner in defiance, this court interferes and prevents the company from taking any further step in the matter; but it only does so if the owner comes with reasonable diligence, at the proper time, and without doing unnecessary injury to the company. But, if a company acting *bona fide*, take possession of property by mistake, and it is merely a question of value between the company and the owner, I apprehend the court does not act in the same way, unless it is shown that there has been culpable negligence on the part of the company." The company in the present case are in the daily use, for public travel, of the land in question as part of their railway. This court refused to restrain them on the filing of the bill, and again when the answer had come in. There is nothing in the evidence which would justify the contrary action now. The bill must be dismissed, and I think that, under the circumstances, it should be with costs.